**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

1) PEOPLE'S ELECTRIC COOPERATIVE, an Oklahoma rural electric cooperative corporation,

        Plaintiff,

v.

1) WESTERN FARMERS ELECTRIC COOPERATIVE, an Oklahoma rural electric cooperative corporation,

        Defendant.

No. CIV-09-_____

## COMPLAINT

Plaintiff People's Electric Cooperative ("PEC"), for its claims for relief against the Defendant, Western Farmers Electric Cooperative ("WFEC"), alleges and states as follows:

### PARTIES AND JURISDICTION

1.    Plaintiff PEC is a rural electric distribution cooperative, organized under the laws of Oklahoma. PEC provides electrical service to approximately 14,000 members in 11 south-central Oklahoma counties. Its system consists of approximately 4,600 miles of distribution and transmission lines. PEC is headquartered in Ada, Oklahoma.

2.    Defendant WFEC is a generation and transmission ("G&T") cooperative, headquartered in Anadarko, Oklahoma. WFEC owns and operates four generating plants, fueled by coal and gas, two located in Anadarko, one in Mooreland, Oklahoma, and one near Hugo, Oklahoma. WFEC owns and maintains more than 3,600 miles of

1

transmission line and has a combined capacity of over 1,400 megawatts, including hydropower allocation. Member-owners of WFEC consist of 19 distribution cooperatives, including PEC, and a United States Air Force base.

## JURISDICTION AND VENUE

3. This is an action for violation of the Sherman Act, 15 U.S.C. § 2, the Oklahoma Antitrust Reform Act, 79 Okla. Stat. § 203, and for breach of contract. Jurisdiction as to the Sherman Act claims exists pursuant to 28 U.S.C. § 1337. As to the remaining claims, supplemental jurisdiction is proper pursuant to 28 U.S.C. § 1367 because the claims set forth are so related that they form part of the same case or controversy.

4. This action also seeks declaratory relief pursuant to 28 U.S.C. § 2201.

5. Venue is proper pursuant to 28 U.S.C. § 1391(a) in that (1) WFEC resides in the Western District of Oklahoma; (2) WFEC is subject to personal jurisdiction in the Western District of Oklahoma; and (3) a substantial part of the events giving rise to PEC's claims occurred within this District.

## FACTS COMMON TO ALL CLAIMS

*Background.*

6. PEC is a non-profit membership corporation created pursuant to 18 Okla. Stat. § 437, *et seq*. PEC provides retail electric service to rural customers in 11 counties, which include Pontotoc, Seminole, Hughes, Pittsburg, Coal, Atoka, Johnston, Murray, Carter, Garvin and McClain.

7.      Prior to 1970, PEC purchased and received wholesale electric power and energy from the Southwest Power Administration ("SPA"), a federal agency charged with marketing electric power from hydroelectric generating units installed in certain federal dams in Oklahoma and surrounding states.

8.      In addition to PEC, five other electric distribution cooperatives in Eastern Oklahoma purchased all their electric power and energy needs from the SPA. Two additional electric cooperatives purchased a portion of their required wholesale electric power and energy from the SPA.

9.      Prior to 1970, the SPA notified the retail electric distribution cooperatives it served that, due to their continued growth and need for additional electric power and energy, the SPA would no longer be able to meet their needs for wholesale electric supply. Therefore, PEC, along with the other distribution cooperatives served by the SPA, formed an organization called the "Sooner Group" and began investigating other sources of long-term power.

*The All-Requirements Contract Between PEC and WFEC.*

10.     On November 9, 1973, PEC entered into a Wholesale Power Agreement with WFEC, as did the other members of the Sooner Group. The Agreements were "all-requirements" contracts, requiring PEC and the other distribution cooperatives to purchase from WFEC all the electric power they required for the operation of their systems.

11.     The Agreements specified that WFEC would set a single rate applicable to all distribution cooperatives purchasing under the Agreements. While WFEC retained

the right to review and revise the rate -- subject to approval by the Administrator of the Rural Utilities Service, WFEC's largest lender -- whatever rate was set would be available to all members.

12.     The initial term of the Wholesale Power Agreement between PEC and WFEC was approximately thirty-seven (37) years, until July 1, 2011.

13.     The Agreement recognized that WFEC did not have the capacity at the time to supply the electric power needs of PEC, and provided that PEC would continue to receive its electric power from the SPA until such time as WFEC would have such capacity. The Agreement provided that PEC would receive from the SPA and pay the SPA for this electric power, even though PEC was a member of WFEC.

14.     Because all members of WFEC were required to pay the same rate for electric power, however, a mechanism was put in place to ensure that PEC paid the same rate as all other members, even though its electric power was actually coming from the SPA.

15.     Under this mechanism, which continued from January of 1974 through December of 1977, PEC received its electric power from the SPA and the SPA would invoice PEC for the electric power delivered. PEC would pay the invoiced amount to the SPA and forward the SPA bill to WFEC. WFEC would recalculate the bill to PEC as though WFEC had supplied the electric power to PEC. The bill amount calculated by WFEC was then reduced by the amount paid by PEC to the SPA, and WFEC would invoice the difference to PEC. In this way, WFEC ensured that PEC was paying the

same rate for its electric power as all other members of WFEC, as required by the Agreement, even though WFEC had not yet begun to supply electric power to PEC.

16. In January of 1978, WFEC contracted with the SPA to receive the electric power directly that would otherwise have continued to be delivered to PEC. At that time, the double-billing stopped, and PEC received a single monthly bill from WFEC for its electric power.

*All-Requirements Contracts as Security for Debts.*

17. The Rural Electrification Administration ("REA") was created by Congress pursuant to the Rural Electrification Act of 1936, with the intent of bringing electricity and power to rural America. The current successor to the REA is the Rural Utilities Service ("RUS").

18. WFEC has historically obtained the majority of its long-term financing from RUS-guaranteed loans funded by the Federal Financing Bank under its RUS mortgage. The security for these loans is WFEC's wholesale power agreements, as well as physical assets. Because the wholesale power agreements are a significant source of security for the loans, the RUS demands that the duration of the agreements be no less than the duration of the financing provided.

19. In early 1978, WFEC began construction of a 400 megawatt coal-fired power generating plant in Hugo, Oklahoma. Upon information and belief, as a condition of loaning funds for the construction of this plant, the RUS required that the Wholesale Power Agreements of WFEC's member-distribution cooperatives be extended to July 1, 2025, to provide loan security for the financing.

20. Although PEC was reluctant to extend its Wholesale Power Agreement with WFEC by an additional fourteen years, PEC was also a borrower from RUS at that time. In order to coerce PEC to acquiesce in WFEC's request for an extension of the Agreement, RUS informed PEC that it would not approve any further loans to PEC unless it executed the requested extension.

21. Therefore, on October 13, 1978, PEC executed an amendment to the Wholesale Power Agreement under which the term of the Agreement was extended until July 1, 2025.

*The Genesis of the Two-Tier Rate.*

22. In the early 2000's, WFEC determined that it would need to build an additional power plant to serve its anticipated future demand. WFEC approached the RUS for funding for the project. Upon information and belief, RUS indicated that WFEC would need to extend its Wholesale Power Agreements with the member-distribution cooperatives by an additional 25 years (to 2050) to provide the loan security required by RUS.

23. In 2006, 17 of WFEC's 19 member-distribution cooperatives extended the term of their Wholesale Power Agreements from 2025 to 2050. Only PEC and Canadian Valley Electric Cooperative ("CVEC") indicated that they would not extend their Agreements, but would allow them to expire by their terms on July 1, 2025.

24. At approximately that time, RUS and WFEC began the process of discussing the handling of the refusal of PEC and CVEC to execute the extensions to their all-requirements contracts with WFEC. RUS indicated to WFEC that, where a G&T

cooperative such as WFEC was seeking new debt from RUS, and certain of its member-distribution cooperatives were unwilling to sign extensions of their wholesale power contracts, RUS would be willing to permit the G&T cooperative to offer two-tier rates to its members. Under this system of rates, the non-extended cooperatives would occupy a separate rate class from those purchasing under extended contracts.

25.     RUS did not require WFEC to adopt a two-tier rate, but merely indicated that a two-tier rate was an alternative that WFEC could consider.

26.     Subsequently, RUS and WFEC agreed to split future loans into two notes based on the electric loads of the group that executed the contract extensions and the group that did not (PEC and CVEC). This was referred to as the "Two Note Strategy." Under this Strategy, a note securing 84% of any future loan from RUS to WFEC would have a normal maturity of approximately 35 years, and a note securing 16% of the same loan would have a maturity of December 31, 2024, regardless of when the loan was obtained (*e.g.* if WFEC were to borrow $1 billion from the RUS on January 1, 2024, the note securing 16% of this amount, or $160 million, would be due on December 31, 2024).

27.     Pursuant to the Two Note Strategy, in 2008 and 2009, WFEC obtained two loans from RUS, each backed by two notes. For each loan, the first promissory note comprised 84% of the principal with an extended maturity date of 2050, and the second promissory note comprised 16% of the principal with a maturity date of 2025. A third loan obtained by WFEC from RUS in 2009 followed the same structure. WFEC pledged as collateral all of its Wholesale Power Agreements, in addition to other assets.

7

28.    In early 2009, WFEC first presented to its Board of Trustees a proposed new rate schedule based on the Two-Note Strategy. The proposed Two-Note Rate would be designated as WFEC Schedule R-15 ("the R-15 Rate").

29.    Under the R-15 Rate, a Debt Service Obligation Charge ("DSOC") would be applied to each member-distribution cooperative with a wholesale power contract which expires prior to December 31, 2050. The DSOC would be based upon the difference between (a) the principal and interest paid during the previous year by WFEC on financing issued under the Two Note Strategy, and (b) the principal and interest which would have been paid during the previous year by WFEC on the same financing if all WFEC's member-distribution cooperatives had executed contract extensions. The full amount of this difference would be shared <u>solely</u> by the non-extending member-cooperatives (*i.e.* PEC and CVEC).

30.    In practice, this means that a large rate increase will be imposed on PEC and CVEC only. The remaining 17 member-distribution cooperatives will pay a lower rate for electric power received under their Wholesale Power Agreements.

31.    Currently, WFEC has three loans from RUS totaling $336 million that are subject to the Two-Note Strategy, and it anticipates obtaining additional future financing under the Strategy. WFEC's preliminary analysis, which has been shared with its member-distribution cooperatives, suggests that the DSOC allocated to PEC and CVEC under these loans will likely be approximately $1.2 million annually at the outset of the loan period, with an extreme escalation in the years approaching the contract termination

date in 2025, depending on the amount of financing obtained by WFEC during this time. These massive surcharges will be passed directly through to PEC's member-customers.

32. WFEC repeatedly excluded PEC from discussions of the impact and legality of the R-15 Rate. For example, at its Strategic Planning Retreat in May of 2009, the WFEC Board of Trustees discussed legal issues related to the R-15 Rate. The Trustee representing PEC was excluded from this meeting, however, despite the fact that he is a duly-appointed member of the Board of Trustees.

33. At the June 19, 2009, meeting of the WFEC Board of Trustees, the Board Chairman formally moved that the Board approve the R-15 Rate. Although the Trustee representing PEC voted "no," and two other Trustees abstained, the motion passed, and WFEC adopted the R-15 Rate.

34. WFEC has submitted the R-15 Rate to the Administrator of the RUS for approval, proposing that it be put into effect as of January 1, 2010.

35. WFEC is using the threatened Two-Tier Rate to coerce PEC to agree to an extension of its all-requirements contract through 2050. As WFEC is aware, there is no way a member-distribution cooperative can pay the punitive rate surcharges imposed under the R-15 Rate. If RUS approves the two-tier rate – which would seem likely as it was the RUS that originally suggested use of this mechanism – PEC will be forced to execute the extension of its all-requirements contract, as well as any future extensions demanded by WFEC, or pay a crippling surcharge and thus be unable to provide electric service to its members at a reasonable rate (*i.e.* go out of business).

36. The relevant product market in this case is the sale of electric power at the wholesale level. The relevant geographic market is the WFEC member systems' service area.

37. Upon information and belief, WFEC has substantial market power in the relevant market.

## COUNT I
## DECLARATORY JUDGMENT/BREACH OF CONTRACT

38. The allegations of the foregoing paragraphs are realleged and incorporated as if set forth herein.

39. The Wholesale Power Agreement executed by PEC and WFEC provides that the rates for sales of wholesale power to member-distribution cooperatives will be available to all members on a non-discriminatory basis.

40. WFEC has adopted a new rate schedule, the R-15 Rate, which includes a surcharge to be imposed solely on PEC and CVEC. The remaining 17 member-distribution cooperatives will pay a lower rate. The adopted rate schedule is thus discriminatory as among cooperative members because all members are not charged the same rate.

41. In adopting the R-15 Rate, WFEC has breached the terms of its Wholesale Power Agreement with PEC. The R-15 Rate will go into effect on January 1, 2010, subject to approval by the Administrator of the RUS.

42. Therefore, PEC is entitled to a declaratory judgment declaring that WFEC has no contractual authority to implement the R-15 Rate, and that its actions constitute a breach of its Wholesale Power Agreement with PEC.

## COUNT II
### DECLARATORY JUDGMENT/BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING

43. The allegations of the foregoing paragraphs are realleged and incorporated as if set forth herein.

44. In adopting the R-15 Rate, WFEC has breached the implied covenant of good faith and fair dealing in all contracts because WFEC has acted to injure PEC's reasonable expectations and has impaired PEC's interest in receiving the benefits that flow from its Wholesale Power Agreement, and is attempting to impose its will on PEC regarding the duration of the contractual commitments.

45. As a proximate and consequent result of WFEC's breach of the implied covenant of good faith and fair dealing, PEC will suffer injury in one of two ways: (a) it will have to pay a crippling surcharge over and above the bargained-for rate for the purchase of electric power, and thus be unable to provide electric service to its members at a reasonable rate (*i.e.* go out of business); or (b) it will have to execute a contract extension that will require it to purchase all its electric power needs from WFEC until 2050.

46. Therefore, PEC is entitled to a declaratory judgment declaring that, in adopting the R-15 Rate, WFEC has breached its duty of good faith and fair dealing as to PEC.

## COUNT III
## ATTEMPTED MONOPOLIZATION

47.   The allegations of the foregoing paragraphs are realleged and incorporated as if set forth herein.

48.   By engaging in the acts and practices alleged above, WFEC is attempting to monopolize the relevant market by coercing PEC and the other member cooperatives into signing long-term all-requirements contracts, in violation of the Sherman Act, 15 U.S.C. § 2, and the Oklahoma Antitrust Reform Act, 79 Okla. Stat. § 203(B).  Such acts and practices by WFEC involve and affect interstate commerce.

49.   WFEC has engaged in the acts and practices alleged above with the specific intent of achieving a monopoly in the market for wholesale sales of electric power in the relevant geographic market.  Given WFEC's substantial market power in this market, there is a dangerous probability of WFEC achieving a monopoly.

50.   As a proximate and consequent result of WFEC's violations of Section 2 of the Sherman Act and 79 Okla. Stat. § 203(B), PEC has been injured in its business and property in that:

   a. it has lost and continues to lose profits which it would have made but for WFEC's actions;

   b. it has lost and continues to lose business good will;

   c. it has suffered and will continue to suffer diminution in its going-concern value; and

   d. its ability to serve its customers has been impaired.

## COUNT IV
## MONOPOLIZATION

51. The allegations of the foregoing paragraphs are realleged and incorporated as if set forth herein.

52. In the alternative, WFEC possesses monopoly power in the relevant market.

53. WFEC has engaged in predatory, exclusionary, and anticompetitive acts with the intent to maintain its monopoly over the sale of wholesale electricity in the relevant geographic market. In particular, WFEC has implemented a discriminatory rate increase, prohibited by its own contracts, to coerce its members into long-term all-requirements contracts, which have and will in the future foreclose a substantial portion of the relevant market to other competitors.

54. These acts and practices have erected barriers to entry because other potential competitors in the relevant market understand that WFEC will continue to force its member-distribution cooperatives to execute successive extensions of their Wholesale Power Agreements, thereby preventing such member-distribution cooperatives from purchasing electric power from other suppliers for the foreseeable future.

55. Such acts and practices by WFEC involve and affect interstate commerce.

56. Because of this exclusionary conduct, PEC and other rural distribution cooperatives and their customers have been deprived of meaningful price competition and supplier choice.

57.     As a proximate and consequent result of WFEC's violations of Section 2 of the Sherman Act and 79 Okla. Stat. § 203(B), PEC has been injured in its business and property in that:

   a. it has lost and continues to lose profits which it would have made but for WFEC's actions;

   b. it has lost and continues to lose business good will;

   c. it has suffered and will continue to suffer diminution in its going-concern value; and

   d. its ability to serve its customers has been impaired

### COUNT V
### UNREASONABLE RESTRAINT OF TRADE

58.     The allegations of the foregoing paragraphs are realleged and incorporated as if set forth herein.

59.     WFEC possesses market power in the relevant market.

60.     By engaging in the acts and practices alleged above, WFEC has unreasonably restrained trade in the relevant market by coercing PEC and the other member cooperatives into signing long-term all-requirements contracts, thus depriving PEC and its customers of meaningful price competition and supplier choice, in violation of the Oklahoma Antitrust Reform Act, 79 Okla. Stat. § 203(A).

61.     Because WFEC's long-term all-requirements contracts have the purpose and effect of maintaining WFEC's monopoly power in the relevant market, there is no redeeming competitive rationale for such conduct, and WFEC's actions are *per se* unlawful.

62. In the alternative, WFEC's actions are unlawful under the rule of reason in that they have injured competition in the relevant market and have raised barriers to entry that foreclose meaningful price competition and supplier choice. There are no procompetitive virtues that justify this anticompetitive impact.

63. As a proximate and consequent result of WFEC's violations of 79 Okla. Stat. § 203(A), PEC has been injured in its business and property in that:

    a. it has lost and continues to lose profits which it would have made but for WFEC's actions;

    b. it has lost and continues to lose business good will;

    c. it has suffered and will continue to suffer diminution in its going-concern value; and

    d. its ability to serve its customers has been impaired

## RELIEF SOUGHT

WHEREFORE, PEC demands that this Court:

A. Declare that, by adopting the R-15 Rate, WFEC has violated the express terms of its contract with PEC.

B. Declare that, by adopting the R-15 Rate, WFEC has also violated the duty of good faith and fair dealing, as alleged in Count II hereof.

C. Enjoin WFEC, and each of its officers, agents, servants, employees, and all others in active concert or participation with them, from implementing the R-15 Rate.

D. Direct that WFEC pay the amount of damages determined to have been sustained by virtue of WFEC's breach of its wholesale power agreement with PEC and breach of the covenant of good faith and fair dealing, as alleged in Counts I and II hereof;

E.  Direct that WFEC pay threefold the damages determined to have been sustained by virtue of the alleged violations of the antitrust laws, as alleged in Counts III and IV hereof, reasonable attorneys' fees, and costs as provided for in 15 U.S.C. § 15 and 79 Okla. Stat. § 205(A)(1);

F.  Declare the Wholesale Power Agreement between PEC and WFEC void as violating the federal and state antitrust laws, as alleged in Counts III and IV hereof;

G.  Enjoin WFEC, and each of its officers, agents, servants, employees, and all others in active concert or participation with them, from continuing the unlawful conduct alleged in Counts III and IV hereof, as provided for in 15 U.S.C. § 26;

H.  Direct that WFEC pay threefold the damages determined to have been sustained by virtue of the alleged violations of the antitrust laws, as alleged in Count V hereof, reasonable attorneys' fees, and costs as provided for in 79 Okla. Stat. § 205;

I.  Enjoin WFEC, and each of its officers, agents, servants, employees, and all others in active concert or participation with them, from continuing the unlawful conduct alleged in Count V hereof, as provided for in 79 Okla. Stat. § 205; and

J.  Award PEC such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED.**

s/D. Kent Meyers
_____
D. KENT MEYERS, OBA# 6168
MARY H. TOLBERT, OBA#17353
EVAN VINCENT, OBA#22325
-Of the Firm-
CROWE & DUNLEVY, P.C.
20 N. Broadway Ave., Suite 1800
Oklahoma City, Oklahoma 73102
(405) 235-7727
(405) 272-5235 (facsimile)

ATTORNEYS FOR PLAINTIFF PEOPLE'S
ELECTRIC COOPERATIVE
